## RICHARDSON et al. v. HILLS et al.

### No. 3025.

Court of Civil Appeals of Texas. Beaumont.
Jan. 14, 1937.

Rehearing Denied April 14, 1937.

Orgain, Carroll & Bell, of Beaumont, for plaintiffs in error.

Howell & Howell, of Beaumont, for defendants in error.

WALKER, Chief Justice.

This appeal is by writ of error, but the parties will be referred to as appellants and appellees.

On or about January 9, 1934, Mrs. Fred B. Hills fell from the eighth floor of the county courthouse of Jefferson county—the jail floor—down the elevator shaft and was killed; this suit was brought by her surviving husband, Fred B. Hills, and her minor daughter, Lottie Hills, appellees, against appellants W. W. Richardson, C. O. Smith, and others, appellants, for resulting damages.

For cause of action appellees alleged that appellant W. W. Richardson was sheriff of Jefferson county at the time of the accident and by virtue of his office was custodian and had charge of the county courthouse under provisions of article 6872, R.S.1925, reading: "Sheriffs shall have charge and control of the courthouses of their respective counties, subject to such regulations as the commissioners court may prescribe; and the official bonds shall extend to and include the faithful performance of their duties under this article"; that as sheriff, appellant Richardson recommended to the commissioners' court of Jefferson county that appellant C. O. Smith be appointed superintendent of the county courthouse, and on his recommendation Smith was given the appointment on the 29th of June, 1933, which position appellant Smith was holding at the time of the accident; that appellant Richardson was acting under authority of article 6872, supra, and also the following articles of the statute:

Article 1603:

"The county commissioners court of each county, as soon as practicable after the establishment of a county seat, or after its removal from one place to another, shall provide a court house and jail for the county, and offices for county officers at such county seat and keep the same in good repair."

Article 2351, subd. 7:

"Each commissioners court shall: * * *

"7. Provide and keep in repair court houses, jails and all necessary public buildings."

Article 3902, as amended by the 43d Legislature, p. 738, c. 220:

"Whenever the County Judge, Sheriff, County Clerk, County Attorney, District or Criminal District Attorney, District Clerk, Tax Collector, Tax Assessor, or the Assessor and Collector of Taxes, Justice of the Peace or Constable, except as provided in Article 3886, as herein amended, shall require the services of deputies, assistants or clerks in the performance of his duties, he shall apply to the County Commissioners' Court of his county for authority to appoint such deputies, assistants or clerks, setting out by sworn application the number needed, the position sought to be filled and the amount to be paid. Said application shall be accom-

panied by a statement showing the probable receipts and disbursements of the office; and said court may make its order authorizing the appointment of such deputies, assistants and clerks and fix the compensation to be paid them and determine the number to be appointed; provided, that in no case shall the Commissioners' Court or any member thereof attempt to influence the appointment of any person as deputy, assistant or clerk in any office. Upon the entry of such order the officers applying for such deputies shall be authorized to appoint them as provided by law; provided that said compensation shall not exceed the maximum amount hereinafter set out. The maximum compensation which may be allowed to a deputy, assistant or clerk to the officers above named, for their services, shall be as follows."

(The following articles are also material on the sheriff's powers and duties:

Article 6869a of the Revised Civil Statutes of Texas, as added by Acts 1931, c. 332, § 1 (Vernon's Ann.Civ.St. art. 6869a), provides:

"Provided that in any county having a population of more than one hundred and thirty thousand (130,000) and less than one hundred and fifty thousand (150,000) inhabitants, as shown by the latest United States Census, and containing two cities of fifty thousand (50,000) population, or more, each, as shown by the said Census, said county composing two or more Judicial Districts, the sheriff shall have power, by writing, to appoint sixteen (16) deputies for his said county, to continue in office during the pleasure of the sheriff, who shall have power and authority to perform all the acts and duties of their principal; and every person so appointed shall, before he enters upon the duties of his office, take and subscribe to the official oath which shall be endorsed on his appointment, together with the certificate of the officer administering the same; and such appointment and oath shall be recorded in the office of the county clerk and deposited in said office. A list of these appointments shall be posted up in a conspicuous place in the county clerk's office. An indictment for a felony of any deputy sheriff appointed shall operate a revocation of his appointment as such deputy sheriff. The salaries of the deputies herein provided for shall be paid monthly by the sheriff out of the Fees of Office as provided in Article 3891 and Article 3902, Revised Civil Statutes, Texas, 1925."

Article 6870 of the Revised Civil Statutes of Texas provides: "Sheriffs shall be responsible for the official acts of their deputies, and they shall have power to require from their deputies bond and security; and they shall have the same remedies against their deputies and sureties as any person can have against a sheriff and his sureties.")

Appellees further alleged that, by virtue of their official relation to Jefferson county, as defined by the articles of the statute quoted above, it was the duty of appellants, and each of them, to maintain, inspect, and keep in repair the building equipment, fixtures, and machinery located in the courthouse; that at the time the courthouse was erected two elevators were installed for the use of the general public and the officials and employees of the county, and that these elevators were located approximately in the center of the building and designated as the north and south elevators; that these elevators were necessary for the use of persons desiring to go to the eighth floor on which floor was located the county jail of Jefferson county; that the hall or passageway on the eighth floor is approximately 8 feet wide and 15 feet long, with its south end opening into the jail; that there were no windows or openings into the passageway, and that all the light and illumination therein was by an electric light or lights located in the passageway; that on the eighth floor the elevator shafts were equipped with opaque metal doors leading into the shaft; that the doors were equipped and operated with an automatic locking device, and so constructed that the elevator operating in the shaft could not operate or move unless the metal door was closed; that, when the door leading into the elevator shaft was closed, it could not be opened except from the inside of the shaft, and only then when the elevator was on the floor where such door was located; that, in addition to the opaque metal doors leading into the elevator shafts on the eighth floor, there was installed a door constructed of steel or iron bars which, when closed, completely covered the entrance into the elevators, including the opaque metal elevator door, which said door was constructed of steel or iron bars and was equipped with locks; that both of said doors covering the en-

trance into the elevator shaft were so constructed that, when unlocked and the contact made, they operated smoothly and quietly on roller bearings; that on January 9, 1934, one Walter Barnes was held in the county jail and that Mrs. Fred B. Hills, the deceased, and the mother of the said Walter Barnes, went to the county jail for the purpose of visiting and discussing the charges against him; that, after completing their business with the said prisoner and officials in the jail, Mrs. Fred B. Hills and Mrs. Barnes left the said jail and entered into the corridor referred to above; that, upon entering into the corridor, it was discovered that the light or lights illuminating the corridor were out, and that the place was in darkness; that one of the women asked one of the jailers how to summon the elevator to that floor, and was informed by him that there was a button located on the north wall of the corridor near the elevator shaft; the two women then began to feel along the walls of the passageway with their hands to locate the said elevator button, Mrs. Barnes being on the east side of the north elevator shaft and Mrs. Fred B. Hills being directly in front of the north elevator shaft; that Mrs. Barnes felt along the wall with her hands and that her hands came in contact with one of the doors, and that the door silently and easily slid open, and that almost simultaneously therewith Mrs. Fred B. Hills stepped into the open elevator shaft and fell eight floors, striking on top of the elevator, which was standing on the first floor, with the result that she was killed; that either the door constructed of steel or iron bars was unlocked but partly closed and the opaque metal door was completely open due to broken or faulty mechanism, or the door constructed of steel or iron bars was completely open and the opaque metal door was closed and slid open when touched by Mrs. Barnes, due to broken or faulty mechanism in the door; that this condition was known to the defendants, or by the exercise of ordinary care and proper inspection could and should have been known and the consequences anticipated; that the spring or mechanism of the door referred to was broken at the time in question by reason of the fact that it had been necessary prior to such time to replace in such door new springs and other mechanism; that Richardson and Smith, jointly and severally, were guilty of negligence causing the death of Mrs. Fred B. Hills, in the following respects: (a) In failing to have the corridor on the eighth floor of the courthouse building lighted or illuminated; (b) in failing to have some identification either by card or other writing identifying the elevator button located on such floor; (c) in failing to have the door constructed of steel or iron bars on the eighth floor of the courthouse leading to the shaft locked, sealed, and made fast; (d) in leaving the door constructed of steel or iron bars on the eighth floor leading into the elevator shaft open; (e) in failing to have the opaque metal door on the eighth floor leading into the elevator shaft locked, sealed, and made fast; (f) in leaving the opaque metal door on the eighth floor of the courthouse leading into the elevator shaft open; (g) that the defendant Richardson was negligent, through his agent and duly appointed and qualified deputy, T. G. Pool, who was jailer at the time in question, in directing Mrs. Hills and Mrs. Barnes to search for the elevator button in the darkened corridor and in permitting Mrs. Hills and Mrs. Barnes to enter into the darkened corridor at the time in question; that Fred B. Hills, the surviving husband, was damaged in the sum of $21,023.50; that Lottie Hills, the surviving daughter of the deceased, was damaged in the sum of $5,000.

The defendants jointly and severally demurred to the petition and filed special exceptions thereto and denied any negligence on their part, and the defendant W. W. Richardson, specially set up that, by article 1603 of the Revised Civil Statutes, it is provided that the commissioners' court of each county is required to provide the courthouse and jail, and to keep the same in good repair; that by article 2351, section 7 thereof, it is provided that each commissioners' court shall provide and keep in repair courthouses, jails, and all necessary public buildings; that by article 6872 the sheriff shall have charge and control of the courthouse, subject to such regulations as the commissioners' court may prescribe; that by the express provisions of these articles, all of them copied above, the duty to keep the courthouse in repair rested with the commissioners' court, and that there was not any legal liability upon W. W. Richardson, as sheriff, to keep same in repair, and that he was not liable for the acts or omissions of any one in failing to keep the same in repair. It was also alleged that the deceased was

guilty of acts of negligence, being the sole proximate cause of her death, or in the alternative that her acts, wrongs, and omissions proximately contributed to cause her injuries and death.

At the close of the testimony the appellants moved for an instructed verdict, which was refused; subject to that motion, appellant Richardson, in writing, requested the court to instruct the jury to return a verdict in his favor, which was refused; subject to the joint request for a peremptory instruction, appellant Smith, in writing, requested the court to instruct the jury to return a verdict in his favor and against appellees, which was refused.

Answering special issues, the jury found, in substance, as follows: (a) That appellant Smith failed to have the light on the eighth floor in the corridor burning at the time in question, but that such default on his part was not negligence; (b) appellant Smith failed to have some means of identification, either by card or other writing, identifying the elevator button on the eighth floor at the time in question; that such default on his part was negligence, and a proximate cause of the death of Mrs. Hills; (c) that appellant Richardson failed to have the door constructed of steel or iron bars on the eighth floor in front of the elevator locked, sealed, and made fast at the time in question; that such default on his part was not negligence; (d) that appellant Smith failed to have the opaque metal elevator door on the eighth floor at the time in question locked, sealed, and made fast, but that such default on his part was not negligence; (e) that the corridor on the eighth floor was dark at the time in question; that T. G. Pool, the jailer in charge of the corridor, directed Mrs. Hills to search for the elevator button in the darkened corridor; that Pool was guilty of negligence in so directing Mrs. Hills to search for the elevator button in the darkened corridor, that such negligence was a proximate cause of the death of Mrs. Hills; (f) that the death of Mrs. Hills was not the result of an unavoidable accident; the jury found in favor of Fred B. Hills in the sum of $5,500 as damages, and in favor of Lottie Hills in the sum of $2,500, as damages.

The jury further found all issues of contributory negligence in favor of appellees. On the return of the verdict appellants moved the court, in rendering its judgment, to disregard and not consider the answers of the jury to certain specific questions, on the ground that these answers were without support in the evidence, and to render judgment in their favor non obstante veredicto, which motion was overruled; exceptions were reserved to this ruling of the court. The court granted appellees' motion for judgment on the verdict of the jury, and on the 14th of June, 1935, entered judgment in their favor for $8,000, with interest at 6 per cent. per annum from date of judgment. Appellants moved for a new trial, among many other grounds alleging misconduct by the jury in its deliberation on its verdict; on the 20th of August, 1934, this motion was overruled, the court finding against appellants on the issue of misconduct. Thereafter Richardson and Smith duly perfected their appeal to this court by writ of error.

The evidence supported appellees' allegations (a) that appellant Richardson was sheriff of Jefferson county and appellant Smith was custodian of the courthouse at the time of the accident; (b) that Smith was appointed custodian on the recommendation of appellant Richardson; (d) that appellant Richardson, as sheriff, had charge of the courthouse, as directed and commanded by the articles of the statute quoted above, and assumed the burdens imposed by these statutes, and through Smith and other employees of the courthouse attempted to discharge his statutory duties; (d) that the jail of Jefferson county was on the eighth floor of the county courthouse; that the courthouse was equipped with elevators, which were situated, equipped, and operated as pleaded by appellees; (e) that the corridor of the jail was located and lighted by electric light, and was without windows or doors except through the elevator and into the jail, as pleaded by appellees; (f) that the elevators opened directly onto the eighth floor into the corridor of the jail; that there is another door at the end of the corridor; that visitors walked from the elevator door to the door at the end of the corridor and rang a bell for the jailer—the bell is at the east end of the corridor, a distance of about fifteen feet from the elevator; (g) that it is the custom, when a visitor to the jail rings the bell, he is admitted by the jailer into the jail; the jailer has an office near the entrance to the jail, separated from the jail cells by bars and doors; (h) to get to the jail cells a visitor

goes by the jailer's desk around through a hall which leads to the cells; (i) the jailer directs visitors in the jail where to go, unless the visitor requests that the prisoner be taken out of the cell, in which event the visitor is seated and the jailer brings the prisoner out; sometimes the visitor goes to the cell and talks to the prisoner through a mouthpiece built in the wall of the jail.

Mrs. Aline Janicke testified, questions and answers reduced to narrative:

"I have been employed as an elevator operator in the courthouse. I worked half a day, taking turns about. The elevators were in the center of the building and were known as the north and south elevators and were the ones used by the public in general. I was working there as an operator on January 9, 1934. I was two feet from the elevator when the accident happened. I heard a noise and something fell on top of the elevator. It was time for me to go back to work; some heavy object fell on the elevator; it was time for me to go back on duty and I took the opposite elevator. I had not operated the north elevator that morning. I had made several trips that morning to the Eighth Floor. The light on the Eighth Floor was not burning; it was not burning on my first trip between 8:30 and 9:00 o'clock. I reported that to Haskell; Haskell was the head janitor; I imagined he worked for Smith. The light was turned on after the accident. They put in another bulb I imagine. When I took the south elevator and went up with two people the light wasn't burning; it seemed to me that Mr. O'Bannion was in the elevator; one got off on the Fourth Floor and the other on the Eighth; that was immediately after the accident. I am no longer employed as an operator.

"I went to work on the south elevator at 7:30. At the time of the accident I was taking my ten minutes rest period and had been across the street for a cup of coffee; Mr. Terrell had relieved me; Mr. Terrell was operating the elevator on the north side. A spring broke on the other elevator, causing the same to jam while I was operating it on one occasion; I do not remember just when it was.

"Q. How do you know it broke? A. The car wouldn't go.

"Q. The car wouldn't operate? A. No.

"Q. Is that a type of car that when a spring breaks in some manner it affects the working of the car so the car won't work up and down the shaft? A. The car won't operate if the door is open and the door was open.

"Q. Do you know on what door that particular one was? A. Eighth Floor.

"Q. On the Eighth Floor? Were you there at the particular floor at the time that happened, or were you on some other floor? A. No, I was on about the Second, I think.

"Q. On the Second Floor; how did you discover that the car wouldn't operate on that particular occasion? A. Well, I had a ring and I tried to go and the car wouldn't operate.

"Q. How did you find out what the trouble was? A. I didn't know what the trouble was. I sent to Mr. Haskell and he came and found the trouble."

Mr. C. O. Smith testified, questions and answers reduced to narrative: "It is a fact that if any elevator door is open that the elevator can not run with that door open. If a spring breaks the door will not make contact and the elevator cannot operate until the door is closed."

Mrs. Minnie Barnes, called as a witness for appellees, testified, questions and answers reduced to narrative:

"Mrs. Fred B. Hills was a close friend of mine. On or about January 9, 1934, Walter Barnes, her son, was in the county jail; he was put in jail about January 7. On the morning of January 9, 1934, I went to visit him in the jail and Mrs. Hills went with me. Mrs. Hills was going to be a witness for her son. We got up there about 9:30 o'clock in the morning. We stayed in the jail about twenty-five or thirty minutes; after we left the jail we saw the jailer; his name was Poole.

"Q. Did you talk to him before you got outside of the jail into the corridor? A. I asked him to open the door for us. The jail door was locked."

She was then asked whether or not she talked to the jailer as she started to leave, and testified:

"A. We started down, and started to open the door, pushed the button, and I couldn't see no button and I told Mr. Poole we couldn't find the button; I couldn't see it.

"Q. What did he tell you? A. He told us it was up on the door there.

"Q. Did you then make a search for it? A. Yes sir; I hunted for it and I couldn't see it."

"Mrs. Hills was standing to my side, kind of looking for the button; the corridor was dark. I think it was darker than it was about twenty-five or thirty minutes before; we did not find the elevator button; Mrs. Hills was standing to my right and I was looking for the button on the door; Mrs. Hills came around on the left-hand side and stepped off in there. She stepped off in the shaft; you could see the shaft out there but you couldn't see the button. You could tell where the elevator shaft was. You could. see the door there but the door was closed."

"Q. How did the door open? A. Well, I don't know. I kept looking for the button. I put my hand up on the door and it flew open. Mrs. Hills stepped into; it was very dim in the shaft. I had my hand upon the door looking for the button, I couldn't see it; I was talking to Mrs. Hills; she was feeling and trying to find the button. After Mrs. Hills fell I just hollered and screamed for help. I had been up there before that particular day once or twice; it was a solid door that had opened when I put my hand on it."

Mr. Fred B. Hills, a witness for the plaintiffs, on direct examination by Mr. Howell, testified that the deceased was fifty-six years of age at her death; that witness would be fifty-five in September; that the funeral expenses were $1,023.50.

It was agreed that Mrs. Hills at the time of her death had a life expectancy of 16.72 years as reflected by the American Table of Mortality; that Mr. Hills had a life expectancy of 18.79 years; and that Miss Lottie Hills had a life expectancy of 44.19 years.

T. G. Poole, the jailer, testified for appellants, questions and answers reduced to narrative, as follows: "I saw Mrs. Hills and Mrs. Barnes in the county jail on January 9, 1934; they asked for admittance about 9:15 or 9:30 in the morning; they rang the bell and I heard it back in my office; the office is about thirty feet from the entrance to the jail in a northerly direction from the door. I was not at the door at the time they arrived there. The corridor at the time they asked for admittance was lighted; it was lighted from an electric light globe in the center; there is another light a short space towards the jailer's office between the door and the jailer's office; there is a ceiling light on the inside of the jail in the hallway a short distance north of the door; both lights, one on the inside and one on the outside in the corridor, were burning. Mrs. Hills and Mrs. Barnes talked to Walter Barnes about thirty or thirty-five minutes; they had not finished their conversation when an officer came to take Barnes to court; he was taken down the elevator used by the sheriff; Mrs. Hills and Mrs. Barnes started to leave about the same time."

Asked as to whether or not he had a conversation with them at the door as they were leaving, he said:

"A. After opening the door for them, as the ladies got just outside the door I pointed to the bell for them, directed them to the bell on the north side wall; they asked me about the bell, I believe.

"Q. They asked you about the bell? A. I am sure they did."

"The corridor at that time had a light in it; you could not see in the corridor without a light. At the time you could see the button and all of the doors and everything. The iron barred door was two-thirds open at the time towards the entrance to the jail. At the same time they left I admitted O'Bannion; he came up on the south elevator. I found out that something had happened by one of the trusties notifying me that there was a woman screaming in the corridor; that was possibly a minute and a half or two minutes after O'Bannion had been admitted; the trusty was Adam Savoie; Savoie was cleaning, sweeping and mopping the corridor inside the jail; he went to the corridor; it was lighted. The door over the elevator at the time was closed. Mr. Richardson got there about four or five minutes afterward. He was with a lawyer, Archie Linscome. I was not present when Richardson tried to open the door."

## Opinion.

Under the verdict of the jury appellees' judgment has support only in the findings (b) that appellant Smith was guilty of negligence in failing to have some means of identification, either by card or other writing, identifying the elevator button on the eighth floor at the time in question, and that such negligence was a proximate cause of the accident, and (e) that T. G. Pool, the jailer, was guilty of negligence in directing Mrs. Hills to search for the elevator button in the darkened corridor, which

constituted a proximate cause of the accident.

We sustain appellants' assignments against both these findings. The negligence found against appellant Smith could not, in law, on the facts of this case, constitute a proximate cause of the accident. The jury found that the corridor was dark. There was testimony to the effect that the deceased and her companion had to feel their way along the walls of the corridor. Under this state of the evidence, and this was appellees' case, had the sign been there, marking the elevator button, the deceased could not have read it; it would have been of no aid to her in the dark corridor. Therefore, as a matter of law, the absence of the sign did not constitute proximate cause. For another reason, as a matter of law, the issue submitted by question (b) did not constitute proximate cause. Neither of the appellants knew of the defective condition of the elevator door. The jury found that the defective condition of these doors, together with the attending facts, was not negligence. Since the condition of the doors was not negligence, and since appellant Smith did not know of this defective condition, he could not have anticipated the accident. It follows that his failure to place a sign, calling the attention of visitors to the location of the elevator button, was not a proximate cause.

The issue submitted by question (e) did not, in law, on the facts of this case, involve an issue of negligence against appellant Richardson. The jury found that the corridor was dark; that Pool directed the deceased to search for the elevator button in the dark corridor; that his act in giving this direction constituted negligence and a proximate cause. The jury also found that the dark corridor, and all issues in relation to the elevator, the defective door, etc., did not constitute negligence against Richardson. Since appellant Richardson and his jailer Pool did not know of the defective condition of the elevator and the elevator doors, and since he was not guilty of negligence in relation to these defects and to the want of a light in the corridor, as a matter of law, Pool was not guilty of negligence in directing the deceased to search for the button of the elevator in the dark corridor. This conclusion inevitably follows because the jury acquitted Richardson of every act upon which negligence could be predicated, as a basis for the negligence submitted by question (e). This same argument applies with equal or greater force to the issue of proximate cause, because, if appellant Richardson did not know of the defective condition of the elevator doors, and was not guilty of negligence in connection therewith, then, as a matter of law, neither he nor his jailer could have anticipated injury to the deceased by directing her to search for the elevator button.

We sustain the court's finding against appellants on the issue of misconduct of the jury, and on the further issue that the question of "insurance" was improperly injected into the record.

We pretermit a discussion of appellants' assignment that, on the record, they were entitled to an instructed verdict.

It follows from what we have said that the judgment of the lower court should in all things be reversed and rendered in favor of appellants, and it is so ordered.

Reversed and rendered.